UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| OLGA DeCEPEDA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-30080-KAR |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM AND ORDER REGARDING
PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND
DEFENDANT'S MOTION TO AFFIRM THE COMMISSIONER'S DECISION
(Dkt. Nos. 14 & 16)

ROBERTSON, U.S.M.J.

## I.    Introduction

Pursuant to 42 U.S.C. § 405(g), Plaintiff Olga DeCepeda ("Plaintiff") appeals the

decision of the Acting Commissioner of the Social Security Administration ("Commissioner" or

"SSA"), denying her claim for Social Security Disability Insurance ("SSDI").  Plaintiff asserts

that the Commissioner's decision denying her such benefits – memorialized in a May 24, 2016

decision by an administrative law judge ("ALJ") – is in error.  Specifically, Plaintiff alleges that

the ALJ erred by failing to:  (A) identify what weight, if any, was assessed to certain opinion

evidence regarding Plaintiff's mental health; (B) conclude that fibromyalgia was a severe

impairment; and (C) conclude that cataracts were a severe impairment.  Plaintiff has moved for

judgment on the pleadings, requesting that the Commissioner's decision be reversed, or, in the

alternative, remanded for further proceedings (Dkt. No. 14).  The Commissioner has moved for

an order affirming the decision of the Commissioner (Dkt. No. 16).  The parties have consented

to this court's jurisdiction (Dkt. No. 13). *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73. For the following reasons, the court will GRANT IN PART the Plaintiff's motion and DENY the Commissioner's motion.

## II.    Procedural Background

Plaintiff applied for SSDI on August 18, 2014, alleging a June 27, 2013 onset of disability due to major depression, left carpal tunnel syndrome in her left hand, "trigger finger" in her right hand, degenerative disc disease and osteoarthritis in her lumbosacral spine, and herpes (Administrative Record ("A.R.") at 165, 180). Plaintiff's application was denied initially and on reconsideration (*id.* at 98-100, 104-06). Plaintiff requested a hearing before an ALJ, and one was held on April 18, 2016 (*id.* at 36-69, 107-08). Following the hearing, the ALJ issued a decision on May 24, 2016, finding that Plaintiff was not disabled and denying Plaintiff's claim (*id.* at 14-35). The Appeals Council denied review on April 28, 2017, and the ALJ's decision became the final decision of the Commissioner (*id.* at 1-5). This appeal followed.

## III.    Legal Standards

### A. Standard for Entitlement to Social Security Disability Insurance

In order to qualify for SSDI, a claimant must demonstrate that he or she is disabled within the meaning of the Social Security Act.[1] A claimant is disabled for purposes of SSDI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42

---

[1] For SSDI, the claimant also must demonstrate that the disability commenced prior to the expiration of her insured status for disability insurance benefits. *See* 42 U.S.C. § 423(a)(1).

U.S.C. § 423(d)(1)(A).  A claimant is unable to engage in any substantial gainful activity when she

> is not only unable to do his previous work, but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for h[er], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. § 423(d)(2)(A).

The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated under the statute.  *See* 20 C.F.R. § 404.1520.  The hearing officer must determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or equals a listed impairment contained in Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from performing previous relevant work; and (5) whether the impairment prevents the claimant from doing any work considering the claimant's age, education, and work experience.  *See id*.  *See also Goodermote v. Sec'y of Health & Human Servs*., 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the five-step process).  If the hearing officer determines at any step of the evaluation that the claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. § 404.1520.

Before proceeding to steps four and five, the Commissioner must make an assessment of the claimant's "residual functional capacity" ("RFC"), which the Commissioner uses at step four to determine whether the claimant can do past relevant work and at step five to determine if the claimant can adjust to other work.  *See id*.

> RFC is what an individual can still do despite his or her limitations.  RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, *Goodermote*, 690 F.2d at 7, including the burden to demonstrate RFC. *Flaherty v. Astrue*, No. 11-11156-TSH, 2013 WL 4784419, at *9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). At step five, the Commissioner has the burden of showing the existence of other jobs in the national economy that the claimant can nonetheless perform. *Goodermote,* 690 F.2d at 7.

      B.  <u>Standard of Review</u>

The District Court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir. Office of Workers' Comp. Programs, U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the

courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *Irlanda Ortiz*, 955 F.2d at 769. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id*. at 770. That said, the Commissioner may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

## IV. Facts

### A. Background

Plaintiff was 50 years old on the alleged disability onset date (A.R. at 165-66). She has a tenth grade education and previously worked as a certified nursing assistant and foster parent (*id*. at 40-43). With her daughters' assistance, she cared for her mother (*id*. at 99). She was able to care and shop for herself, prepare meals, and clean her house, sometimes with assistance (*id*. at 200). She sometimes walked with a cane because of pain (*id*. at 204).

### B. Medical Evidence[2]

On July 12, 2013, Plaintiff was seen at Baystate Brightwood Health Center for a recent history of diarrhea (*id*. at 281-87). During the visit, Plaintiff indicated that she wanted help with depression because she had a lot of family stress. She advised that she had stopped taking Wellbutrin because of side effects. She was started on Lexapro and referred for a mental health evaluation (*id*.).

On January 10, 2014, Plaintiff established a primary care relationship with Brian Banker, M.D., of RiverBend Medical Group (*id*. at 378-381). Plaintiff's visit with Dr. Banker focused on

---

[2] The medical record in this case is extensive. The court's summary is limited to the records that appear most relevant to the issues in the case.

Plaintiff's history of asthma and depression. Plaintiff denied joint pain or swelling, back pain, or muscle pain (*id.*). Her physical examination was unremarkable (*id.*).

On January 29, 2014, Plaintiff underwent an eye examination (*id.* at 376-378). Plaintiff complained of blurry vision, seeing shadows in the corners of both eyes, and a headache every day for the last month-and-a-half. Her visual acuity was 20/25 in both eyes (*id.* at 376). She was diagnosed with "floaters" (*id.* at 377).

On February 26, 2014, Plaintiff saw Dr. Banker and reported left wrist pain for about two years (*id.* at 369-372). Her left wrist exhibited no swelling or tenderness to palpation. Dr. Banker ordered an x-ray of her wrist, and made a referral to orthopedics (*id.*). The x-ray of Plaintiff's wrist showed mild sclerosis, but no other joint, skeletal, or soft tissue abnormalities (*id.* at 339-340).

On April 11, 2014, Plaintiff saw Dr. Banker for a physical examination (*id.* at 364-69). At that time, Plaintiff reported that she saw her eye doctor for some vision changes, got glasses, and was told she had the beginning of a cataract. Plaintiff advised that her left wrist pain continued, but that she had missed her orthopedic evaluation due to moving. Plaintiff also advised that she had been experiencing pain along the right medial ankle/heel for approximately one year. Dr. Banker ordered an x-ray of Plaintiff's foot and made a referral to podiatry. Plaintiff indicated that she had "issues with sadness" and had done well with Zoloft in the past. Dr. Banker restarted Plaintiff on Zoloft and asked her to start the process of finding a psychiatrist and to follow up in one month (*id.*). Plaintiff was seen again on May 12, 2014, to go over test results (*id.* at 360-64). Plaintiff indicated that she was not experiencing any side effects from the Zoloft, but that it had not brought about any change. Dr. Banker increased her dosage from 50 to 100 milligrams (*id.*).

On June 28, 2014, Plaintiff sought emergency treatment at Mercy Medical Center for right-sided abdominal pain radiating to her back, which she rated an eight out of ten in severity (*id.* at 397-402). She had mild pain with palpation over that area, but her musculoskeletal, neurological and psychiatric signs were otherwise normal. She was told to drink fluids, take Vicodin as needed for pain, and to follow-up with her primary care physician (*id.*). On July 10, 2014, Plaintiff was seen by Mary Catherine Carpenter, CNM, complaining of persistent right flank pain (*id.* at 353-57). Ms. Carpenter reviewed Plaintiff's emergency room records and noted there was "nothing seen to explain her flank pain." Plaintiff was advised to follow-up with her PCP (*id.*).

Plaintiff went for an emergency room follow-up with Dr. Banker on July 17, 2014 (*id.* at 349-353). She reported continued right low back and flank pain that radiated down into her right leg. Plaintiff reported intermittent numbness and tingling in her leg, but no weakness. Physical examination revealed no pain to spinal palpation, but muscle spasms that were worse on the right. Dr. Banker noted that a CT scan done in the ER did not show a clear etiology for her symptoms. Dr. Banker suspected that Plaintiff might have a low back problem and ordered a spine x-ray and prescribed a muscle relaxant for the spasms and hydrocodone for breakthrough pain. The x-ray showed moderate loss of disc height at L5-S1, with mild sclerosis and facet arthropathy. Dr. Banker referred her for chiropractic treatment (*id.*).

Plaintiff initiated chiropractic treatment with Michael E. Nicaretta, D.C., on July 28, 2014. Her chief complaint was of right-sided lower back pain with intermittent referral into her right leg, which had started approximately one month earlier (*id.* at 345-349). Plaintiff rated her pain as a nine on a ten-point scale. She indicated that prolonged standing exacerbated the problem. Plaintiff was diagnosed with moderate degenerative disc disease and mild facet

arthropathy at L5-S1 joint and mild bilateral sacral iliac joint arthritis (*id.*). Plaintiff continued

chiropractic treatment through October 2014, through which time she continued to report right-

sided back pain (*id.* at 311-12).

Plaintiff saw Ms. Carpenter again on July 30, 2014 (id. at 340-344). Plaintiff reported

increased stress due to taking care of her mother who had Alzheimer's disease, having a teenager

at home, and opiate use in her extended family. She reported a fear of sleeping because she felt

like she would die. Ms. Carpenter referred Plaintiff to behavioral health for therapy (*id.*).

On August 13, 2014, Plaintiff went to the Center for Psychological and Family Services

as a walk-in patient (*id.* at 415-429). The interviewing social worker, Nicolette Slezak, M.S.W.,

completed an Adult Comprehensive Assessment and an Individualized Action Plan. Plaintiff

advised Ms. Slezak that she had "felt depressed since [the] 1990s," felt "'sad' most of the day,"

isolated herself, and was lonely. Plaintiff indicated that she did not work and did not want to

work. Plaintiff advised that she wanted individual therapy to improve her self-esteem, reduce

her depressed mood, and have someone with whom to talk. On examination of her mental status,

Plaintiff's behavior appeared relaxed, and her appearance, eye contact, speech, emotional state-

affect, facial expression, perception, thought content, intellectual functioning, thought process,

orientation, memory, insight, and judgment were all within normal limits. Ms. Slezak diagnosed

Plaintiff with depressive disorder not otherwise specified and assigned Plaintiff a Global

Assessment of Functioning (GAF) score of 55, reflecting moderate symptoms.[3] Ms. Slezak and

---

[3] "'The Global Assessment of Functioning Scale ranges from 0 ("persistent danger of severely hurting self or others") to 100 ("superior functioning"). A GAF score of 41-50 indicates "serious symptoms" and "serious impairment in social, occupational, or school functioning." Scores of 51-60 and 61-70 reflect moderate symptoms/moderate impairment in functioning and some mild symptoms/some difficulty functioning, respectively.'" *Viveiros v. Berryhill*, Civil Action No. 1:15-cv-13100-ADB, 2018 WL 3057730, at *5 n.3 (D. Mass. June 20, 2018) (quoting *Rivera ex rel. Z.G.O. v. Astrue*, No. CIV. A. 08-11109-GAO, 2009 WL 4063223, at *1 n.3 (D. Mass. Nov.

Plaintiff signed a treatment plan calling for individual therapy, but there is no record of such treatment and her file was administratively closed on November 3, 2014 (*id.* at 429).

On September 29, 2014, Plaintiff went to RiverBend for a physiatric evaluation (*id.* at 315-19). Plaintiff reported that she had been experiencing pain and numbness in her left wrist for over a year and reported a recent onset of right wrist and neck pain as well. Examination of her musculoskeletal system showed tightness in both arms, but her range of motion and strength were normal, and she showed no sign of pain or functional deficits in her neck and back. Plaintiff was diagnosed with suspected bilateral carpal tunnel syndrome (*id.*).

On November 11, 2014, Plaintiff reported to RiverBend for an EMG (electromyograph) (*id.* at 438-441). At the time, Plaintiff told RiverBend physiatrist Rose Bernal-Larioza, M.D., that she had "pain almost everywhere, in her legs, back, arms, and neck." The EMG study confirmed the provisional diagnosis of carpal tunnel syndrome, but did not "explain all of [Plaintiff's] diffuse pain and weakness on [her] left hand" (*id.*). A cervical spine x-ray showed spondylosis (*id.* at 440) and a follow-up CT scan showed mild to moderate degeneration with mild neuroforaminal narrowing at C4-C5 and C5-C6 (*id.* at 718).

On November 12, 2014, Plaintiff saw Dr. Banker to follow-up on her emergency room visit regarding her headaches (*id.* at 434-38). Plaintiff advised that she was having some issues with concentration, not necessarily memory. She could not state how long this had been occurring. Dr. Banker advised Plaintiff that depression can affect concentration and that she should monitor her symptoms and discuss the issue with her therapist (*id.*). Plaintiff reported right-sided hip and leg pain. Dr. Banker indicated that Plaintiff had diffuse joint pain, a recent

---

24, 2009) quoting *Walker v. Barnhart*, No. 04-11752-DPW, 2005 WL 2323169, at \*4 n.3 (D. Mass. Aug. 23, 2005)).

diagnosis of carpal tunnel syndrome, and a CT of her neck was pending through physiatry. Dr. Banker noted that "[f]ibromyalgia is a possibility given the significant joint pain she has overall," and he started Plaintiff on gabapentin (*id.*).

Plaintiff saw Dr. Banker on February 5, 2015, primarily for upper respiratory issues, but she also reported headaches, vertigo, "trigger finger" in the right fourth finger, and memory issues (*id.* at 693-96). An examination was normal except for nasal swelling and shoulder muscle tightness. He referred Plaintiff to Neurology (*id.*).

On March 4, 2015, Plaintiff returned to treatment at the Center for Psychological and Family Services "after she realized that she has poor relationships with her husband . . . her children and extended family" (*id.* at 602-04). Plaintiff admitted she was "very irritable, yells a lot, gets upset over small things," and "feels sad a lot." She was assigned a GAF score of 55 (*id.*).

On March 5, 2015, Plaintiff saw Dr. Bernal-Larioza for carpal tunnel syndrome (*id.* at 689-693). Plaintiff reported worsening weakness and fatigue in her hands and forearms. She additionally reported fatigue in her legs, but denied falls and her gait appeared normal. The only positive findings from a musculoskeletal examination were positive Tinel's in the wrist bilaterally and a trigger finger on the right fourth finger. The doctor diagnosed muscle weakness. Plaintiff was administered a steroid injection in her right wrist (*id.*).

Plaintiff was treated at the Eye & Lasik Center on March 6, 2015 for a throbbing feeling in her right eye that she had been experiencing for a couple of months (*id.* at 641-643). Plaintiff also reported seeing floaters and dryness in both eyes. Plaintiff was diagnosed with headache and cataracts in both eyes. It was noted that Plaintiff's ocular condition was stable, and no

treatment was currently recommended.  Her corrected vision was 20/20 in each eye.  Plaintiff

was advised to contact the Eye & Lasik Center with any decrease in vision (*id.*).

Plaintiff saw Dr. Banker on April 1, 2015, at which time she reported that she was still

getting headaches and that she was experiencing bilateral leg pain that was worse on the right

(*id.* at 686-89).  A musculoskeletal examination revealed bilateral trapezius muscle tightness.

Dr. Banker diagnosed Plaintiff with myalgias of unclear etiology.  He referred Plaintiff to a

rheumatologist for further evaluation.  Dr. Banker suspected that Plaintiff's headaches were due

to muscle spasms.  He had prescribed Zanaflex, but noted that Plaintiff had not tried it (*id.*).

On April 27, 2015, Plaintiff underwent a neurological evaluation with Michael L. Rossen,

M.D., for assessment and management of "a lot of forgetting," which Plaintiff reported had been

occurring since about 2010 and slowly worsening (*id.* at 485-488).  Plaintiff indicated that she

was taking medications for sleep, depression, and fibromyalgia pain, the latter of which was

sufficiently helped by the medication.  Plaintiff reported forgetting the names of favorite

television shows or what she was talking about with a friend.  However, Plaintiff reported being

able to drive without getting lost, cook, and pay the bills.  Dr. Rossen administered some testing,

the results of which showed that Plaintiff had normal executive functioning and could answer

two out of three questions correctly during delayed memory testing with distraction.  Plaintiff

was concerned about an Alzheimer's diagnosis.  Dr. Rossen advised that he did not believe

Plaintiff had Alzheimer's.  He indicated his belief that depression played a big role in her

forgetfulness and that a possible sleep disorder might worsen it.  Plaintiff asked about "fibro-

fog," and Dr. Rossen advised that this was a "recognized entity and could also play a part" (*id.*).

On June 2, 2015, Plaintiff returned to Dr. Adler at New England Orthopedic Surgeons

(*id.* at 607-08).  Plaintiff reported that she had recently been treated with a corticosteroid

injection in her right hand for carpal tunnel syndrome, which did not improve her numbness or tingling, but did improve her triggering. Upon examination, Plaintiff had a symmetric range of motion of her bilateral wrists and digits with no instability. Carpal tunnel compression testing was positive on the right. Dr. Adler discussed with Plaintiff carpal tunnel surgery, but explained that it would only relieve some of her symptoms (numbness, tingling, and at least some of the pain), while leaving others (tremor in her hand and the overwhelming sense of weakness in all her extremities). Plaintiff indicated that she was also interested in surgical treatment of her flexor tenosynovitis, although she was currently asymptomatic. Plaintiff agreed to discuss both surgical options with her PCP before committing to surgery (*id.*).

Plaintiff underwent cognitive testing on June 3, 2015 (*id.* at 481-84). She scored 29 out of 30 on a mini mental status examination. Her attention, concentration, and memory were all normal. Scores indicated severe anxiety. She was diagnosed with encephalopathy (*id.*).

That same day, Plaintiff returned to the Eye & Lasik Center complaining of her vision being dim and blurry all the time (*id.* at 637-640). Plaintiff advised that when reading, she could see bigger words, but not little ones and reported that she did not drive at night because of difficulty seeing when headlights are coming at her. Plaintiff also indicated that her eyes were itchy. Plaintiff's corrected vision in each eye was 20/25. Plaintiff was diagnosed with cataracts in both eyes, headache, and diabetes mellitus type II, controlled, with no complications. It was again noted that Plaintiff's ocular condition was stable, although potentially progressive (*id.*).

Plaintiff returned to Dr. Rossen on June 8, 2015. She confirmed forgetfulness beginning around 2010 and slowly worsening. Dr. Rossen noted that Plaintiff had significant depression

and severe anxiety (*id.* at 477-480). His treatment notes reflect that Plaintiff "has fibro-myalgia with multifocal pain" and indicate that "fibro-fog" might relate to her memory issues (*id.* at 478).

By June 13, 2015, records from the Center for Psychological and Family Services indicate that Plaintiff reported that she had more energy, was doing more chores at home, and was slightly less irritable. She was active in the community and did not need psychiatric medication (*id.* at 598-99).

Plaintiff saw Dr. Banker on July 20, 2015 (*id.* at 680-83). Plaintiff reported that her muscles felt "weak and achy," that she had tremors, and that physical therapy had recommended that she use a walker. Dr. Banker did not observe any tremors during his examination and observed "no focal extremity weakness" (*id.*).

On August 6, 2015, Plaintiff met with Dr. Bernal-Larioza (*id.* at 676-680). Plaintiff reported having tremors in her hands and trembling and twitching in her legs that made it difficult to walk. At that time, Plaintiff showed no neurological or musculoskeletal abnormalities (*id.*).

Plaintiff was referred to Catherine Spath, M.D., on August 11, 2015 for triggering in her hands, worsening symptoms of carpal tunnel syndrome, and weakness in the upper extremity (*id.* at 633-34). Plaintiff reported that a previous injection to her wrist was not particularly helpful. Her last conduction study was in November 2014 and showed some mild medial neuropathy bilaterally. Dr. Spath conducted a physical examination of Plaintiff which revealed no obvious signs of thenar, hypothenar, or intrinsic atrophy. She could flex, extend, abduct, and adduct her fingers. Tinel signs were negative, while Phalen signs caused pain in her wrists. She exhibited some very slight triggering at the ring finger on her right hand when palpated. Plaintiff was able to gently flex and extend both wrists, flex and extend her elbows, and lift her arms up by her

sides. Dr. Spath noted that Plaintiff's neck was a little stiff, but that she could turn it gently to either direction. An x-ray of the cervical spine showed a little bit of arthritis at C4-5, but no significant foraminal stenosis. Dr. Spath felt that Plaintiff's provocative signs [were] fairly underwhelming" (*id.* at 634). She recommended splinting and monitoring, but indicated that Plaintiff did not need "to be rushed off to the operating room at this time" (*id.*).

Plaintiff underwent a rheumatological consultation with Munir Ahmad, M.D., on August 12, 2015 for generalized muscle aching (*id.* at 727-28). Plaintiff presented with fatigue, myalgias, arthralgias, poor sleep despite medication, frequent headaches, and declining memory. She reported increased sensitivity to touch. Examination revealed a positive Tinel's sign, but no other evidence of neurological or musculoskeletal deficits. A "[f]ibromyalgia tender points screen [was] negative." Dr. Ahmad noted that Plaintiff's symptoms were suggestive of fibromyalgia, although she did not have the tender points. Dr. Ahmad recommended a different sleep medication and regular physical activity, such as 30 minutes of walking daily. Plaintiff was advised to follow-up in six weeks for reevaluation (*id.*).

During an August 13, 2015 appointment with Dr. Rossen, Plaintiff advised that she was having tremors or shaking throughout her body, most prominently in her right arm (*id.* at 583-86). She indicated that the shaking commenced on March 5, 2015, following an injection in her wrist. Dr. Rossen opined that there could have been a "partial extension of steroids systemically enhancing a previously more mild predisposition for essential tremor. Otherwise, her symptomatic tremor throughout her body and more prominent tremor in her right upper extremity was most likely related to a combination of anxiety superimposed on an otherwise mild predisposition for essential tremor" (*id.*). The doctor noted that, in addition to right wrist and hand pain, Plaintiff continued to have the multifocal pain "that she has in the context of

fibromyalgia" (*id.* at 583-84).  He noted that "fibro-fog" might be contributing to her memory problems (*id.* at 584).

On August 27, 2015, Plaintiff voluntarily cancelled her treatment with the Center for Psychological and Family Services (*id.* at 597).

Plaintiff went to Medical Express for ongoing neck and back pain on September 15, 2015 (id. at 541-558).  Plaintiff described her pain as achy, and it was worse with bending forward or moving her neck.  She had pain at the end of range of motion of her neck.  Plaintiff was diagnosed with headache, cervicalgia, pain in thoracic spine, and muscle spasms, and was referred to chiropractic care (*id.*).  The notes from the visit reflect "ongoing temporary partial disability due to pain" with a favorable prognosis (*id.*).

Plaintiff returned to Dr. Spath on November 10, 2015 (*id.* at 632).  Dr. Spath noted that Plaintiff had stopped taking Zoloft, and shortly thereafter her hand shaking went away.  Plaintiff reported that she was being more mindful of taking care of herself and was doing much better as a result.  Plaintiff reported occasional minor triggering in her fingers and extremely mild carpal tunnel symptoms.  Dr. Spath recommended that Plaintiff continue with the measures she had been taking, including splinting, but noted that nothing seemed to need surgery at the time (*id.*).

Plaintiff saw Dr. Banker on November 20, 2015 (*id.* at 662-665).  Plaintiff indicated that her memory had improved.  She reported using wrist braces for her carpal tunnel syndrome, which were helpful, though she continued to experience daily pain.  Plaintiff reported continued leg pain and weakness in her ankle joints, but reported that, overall, she was feeling much better.

Plaintiff's treatment plan included continued use of her wrist braces and surgery for her carpal tunnel syndrome. Her tremors had resolved (*id.*).

### C. Opinion Evidence

#### 1. *State Agency Opinions*

K. Malin Weeratne, M.D., a state agency expert who reviewed Plaintiff's medical records as of October 21, 2014, assessed Plaintiff as having the following exertional limitations: she was limited to lifting up to ten pounds frequently and twenty pounds occasionally, to standing and/or walking for about six hours in an eight-hour workday; to sitting for more than six hours on a sustained basis in an eight-hour workday, and to pushing or pulling up to twenty pounds occasionally (*id.* at 75-77). Plaintiff could frequently climb ramps/stairs, balance, stoop, kneel, and crouch, and occasionally climb ladders/ropes/scaffolds and occasionally crawl (*id.*). Plaintiff was limited in her ability to use her left hand for handling objects. Finally, Plaintiff should avoid concentrated exposure to hazards such as machinery and heights (*id.*). On December 19, 2014, David Cramer, D.O., affirmed most of Dr. Weeratne's assessment, but he opined that Plaintiff also should avoid concentrated exposure to extreme cold, wetness, humidity, and irritants (*id.* at 89-92).

Jon Perlman, Ed.D., a state agency psychologist, reviewed Plaintiff's medical records as of October 2, 2014, and found that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of an extended period (*id.* at 73-74). He opined that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and to

perform at a consistent pace without an unreasonable number and length of rest periods (*id.* at 77-78). In narrative form, Dr. Perlman explained that Plaintiff was capable of completing simple, routine tasks and could sustain concentration for at least two hours in simple one and two-step tasks. Dr. Perlman further opined that Plaintiff was able to relate in a socially appropriate manner (*id.* at 78.). On December 6, 2014, Michelle L. Imber, Ph.D., another state agency psychologist, generally agreed with Dr. Perlman's assessment (*id.* at 87-89, 92-94). In narrative form, Dr. Imber explained that Plaintiff was capable of sustaining pace and focus to simple tasks despite momentary fluctuations in concentration when her anxiety was piqued. She indicated that Plaintiff would focus best in a low-demand environment (*id.* at 93).

## 2. *Other Opinion Evidence*

On or around August 28, 2014, Ms. Slezak completed a psychiatric questionnaire at the request of the SSA (*id.* at 303-306). Ms. Slezak's responses to the questionnaire were very similar to her August 13, 2014 treatment notes. In the questionnaire, Ms. Slezak indicated that she first examined Plaintiff on August 13, 2014, and most recently examined her on August 26, 2014. Ms. Slezak identified Plaintiff's diagnosis as depression not otherwise specified and assessed her current GAF score at 56. Regarding her mental status, Ms. Slezak wrote "depressed mood, irritable, lonely feeling, feeling upset her children are all grown up." Regarding levels of adaptive functioning, Ms. Slezak wrote "ct. reports having difficulty getting out of bed, and starting her day, she isolates herself in the house, tends to keep to herself, minimal social-interactions." In describing Plaintiff's concentration and attention, Ms. Slezak reported that "ct. has lack of energy causing it difficult [sic] to complete what she would like to daily; depressed mood." Ms. Slezak further stated, "ct. will begin a task and have difficulty completing it, she reports she begins 'thinking' to [sic] much and is distracted by what she was doing." Ms. Slezak

reported that Plaintiff was able to remember work-like tasks and instructions. Ms. Slezak noted that "ct. becomes easily overwhelmed and will begin chore but not always be able to complete task." In addressing Plaintiff's prognosis, Ms. Slezak advised, "ct. will benefit from weekly therapy to help relieve depressive symptoms, learn coping skills to use when depressed and reduce isolation and engage more in community." Psychologist Alan J. Stone, Ph.D., co-signed the questionnaire (*id.*).

    D. <u>Hearing Testimony</u>

    *1. Plaintiff's Testimony*

Asked why she believed she could no longer work, Plaintiff testified that there had been a lot of changes with her. She had problems with her memory that caused her to lose track of what she was doing or saying (*id.* at 44-45). There were also physical issues. Her upper extremities did not work anymore. She had carpal tunnel syndrome and a trigger finger. She dropped things like cups, glasses, and bowls, found buttoning clothes difficult, and could not twist the tops off of jars and bottles (*id.* at 57-58). She also had problems with her lower extremities: she got spasms in her lower legs and they were very weak (*id.* at 45). Her shoulders, neck and lower back hurt on a regular basis enough that she would have to stop activities (*id.* at 47, 55). She had to stop walking after 100 feet because of pain, could not stand still in the same place, and could sit for about 20 to 25 minutes before her tailbone started hurting (*id.* at 47-48). She testified that she had seen a rheumatologist who diagnosed fibromyalgia and that she had body-wide pain and headaches that she attributed to fibromyalgia (*id.* at 58-59). She said she also had asthma and cataracts in both eyes. When she went for her eye examination that year, they changed the prescription for her eyeglasses. The prior year, they had declined to do the surgery. She was

returning to see if she was ready to get the surgery. She said she could hardly see even with glasses, needed large print, and had difficulty seeing at night (*id.* at 60-61).

Plaintiff reported that she lived with her mother, nephew, and son. In terms of daily activities, she did some housework and cooking and did laundry with help from her daughter (*id.* at 49-50). She was a loner, always by herself (*id.* at 50). She watched television, went out to her porch and garden, and to her appointments (*id.* at 51). She had "deep, deep issues" with depression. She liked to socialize with people and talk, but she did not feel right when she was around a lot of people or at gatherings or a restaurant (*id.* at 61-62). She stopped going to counseling because of some kind of dispute about the number of medications she was taking (*id.* at 52). She was scared to go to sleep, scared to shut her eyes and only got about two hours a night (*id.* at 62).

### 2. *Vocational Expert's Testimony*

The vocational expert ("VE") testified that a hypothetical individual of Plaintiff's age, educational background, work history, and RFC could not perform her past jobs as a certified nursing assistant or foster parent (*id.* at 65-66). Such an individual could, however, perform work as a garment sorter (DOT #222.687-014), with approximately 32,000 jobs nationally and 500 in Massachusetts; a weigher (DOT #222.387-074), with approximately 28,000 jobs nationally and 500 in Massachusetts; and a price marker (DOT #209.587-034), with approximately 264,000 jobs nationally and 6,300 in Massachusetts (*id.* at 66-67). The VE testified that adding to the first hypothetical that the individual would be allowed to alternate to sitting for five minutes after every 30 minutes of standing or walking and would only occasionally interact with the public, the individual would be able to do the same jobs, but that based on the postural changes, the numbers would be reduced by approximately half (*id.* at 67-

68).  The VE testified that adding to the second hypothetical that the individual would be off-task 15% of the time in a normal eight-hour workday would preclude all work by that individual on a full-time, sustained basis (*id*. at 68).

## V.     The ALJ's Decision

To determine whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations.  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date (*id*. at 19).  At the second step, the ALJ found that Plaintiff had a combination of severe impairments consisting of: "major depressive disorder, carpal tunnel syndrome, trigger finger, degenerative disc disease, sleep apnea and herpes" (*id*.).  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*id*. at 20).  Before proceeding to steps four and five, the ALJ found that Plaintiff had the RFC to:

> perform light work as defined in 20 C.F.R. 404.1567(b) except she can sit for six hours in an eight-hour workday but she needs to alternate to standing for five minutes after sixty minutes of sitting. She can stand and/or walk for six hours in an eight-hour workday but she needs to alternate to sitting after thirty minutes of standing or thirty minutes of walking.  The claimant can push and pull as much weight as she can lift or carry.  She can no more than occasionally use her left hand for handling objects.  The claimant can no more tha[n] frequently climb ramps and stairs, balance, stoop, kneel, or crouch but she can no more than occasionally crawl or climb ladders, rope or scaffolds.  She cannot tolerate more than frequent exposure to extreme cold; dust, odors, fumes and pulmonary irritants; humidity; and wetness and more than occasionally exposure to hazards such as unprotected heights and dangerous moving machinery.  The claimant can understand, remember and carryout simple, routine and repetitive tasks but not at a production rate pace (e.g., assembly line work).  She can use judgment for simple work-related decisions.  The claimant can respond appropriately to occasional interaction with the public.

> She can perform work that requires her to tolerate few changes in
> the work setting

(*id.* at 21).[4]  At step four, the ALJ determined that Plaintiff was unable to perform any past

relevant work (*id.* at 28).  At step five, relying on the testimony of the VE, the ALJ determined

that Plaintiff could perform jobs found in significant numbers in the national economy taking

into account Plaintiff's age, education, work experience, and RFC, and, therefore, Plaintiff was

not disabled (*id.* at 29-30).

## VI.  Analysis

Plaintiff alleges that the ALJ erred by failing to (A) identify what weight, if any, he

assigned to the opinion of psychologist Alan Stone, Ph.D.; (B) identify fibromyalgia as a severe

impairment; and (B) conclude that cataracts were a severe impairment.  The court addresses each

alleged error in turn.

### A.  Weight Assigned to Opinion Evidence from Dr. Stone

Plaintiff contends that a Psychiatric Disorder Questionnaire filled out by Nicole Slezak,

MSW, and co-signed by Dr. Stone is an "opinion of [a] treating mental health source," and since

the ALJ "failed to identify what weight, if any, he assessed to" this opinion, "this Decision

---

[4] Light work is defined as:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of
> objects weighing up to 10 pounds.  Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and pulling of arm
> or leg controls.  To be considered capable of performing a full or wide range of
> light work, you must have the ability to do substantially all of these activities.  If
> someone can do light work, we determine that he or she can also do sedentary
> work, unless there are additional limiting factors such as loss of fine dexterity or
> inability to sit for long periods of time."

20 C.F.R. § 404.1567(b).

should be remanded back for a proper evaluation of this medical opinion" (Dkt. No. 15 at 11, 15). *See* 20 C.F.R. § 404.1527(c)(2) (The SSA "will always give good reasons in our notice of determination or decision for the weight we give your treating source's medical opinion."). Plaintiff incorrectly characterizes the Psychiatric Disorder Questionnaire as an opinion of a "treating mental health source" (Dkt. No. 15 at 11, 13–15).

Under the regulations that were in effect at the time, Ms. Slezak was not a treating source because she was not an acceptable medical source. "Treating source means your own . . . *acceptable medical source* who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502(a)(2) (emphasis added). Acceptable medical sources in the area of mental health were defined as "[l]icensed or certified psychologists. Included are school psychologists, or other licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing intellectual disability, learning disabilities, and borderline intellectual functioning only." 20 C.F.R. § 404.1513(a)(2). As a social worker, Ms. Slezak was not an acceptable medical source as defined by 20 C.F.R. § 404.1513(a)(2).

Dr. Stone, who co-signed the questionnaire, was a licensed psychologist, *see* 20 C.F.R. § 404.1513(a)(2) (including licensed psychologists as acceptable medical sources), but "'a physician's sign-off on a [non-acceptable medical source's] opinion' does not transform that opinion into an acceptable medical source." *Raposo v. Berryhill*, Civil Action No. 17-cv-10308-ADB, 2018 WL 1524570, at *7 (D. Mass. Mar. 28, 2018) (quoting *Allen v. Colvin,* No. CA 13-781L, 2015 WL 906000, at *11 (D.R.I. Mar. 3, 2015); citing *Lobov v. Colvin*, No. 12-cv-40168-TSH, 2014 WL 3386567, at *14 n.8 (D. Mass. June 23, 2014)). In *Raposo*, the record indicated

that an acceptable medical source saw the claimant at least once before co-signing a medical statement in connection with the claimant's disability application. The *Raposo* court held that this single visit was insufficient to "recalibrate the weight owed" to the medical statement. *Id.* In the present case, there is no indication in the record that Dr. Stone had even one meeting with Plaintiff, and Dr. Stone's signature on a questionnaire filled out by a non-acceptable medical source is, therefore, insufficient to transform the questionnaire into an opinion of an acceptable medical source presumptively entitled to controlling weight. *See Coppola v. Colvin*, No. 12–492, 2014 WL 677138, at *9 (D.N.H. Feb. 21, 2014) (finding that a co-signature does not indicate that the accepted medical source ever examined claimant, and was insufficient to prove an ongoing treatment relationship). Due to the lack of any showing of an ongoing treatment relationship, Dr. Stone is not considered a treating source, and the ALJ was not required to give any special weight to the opinions in the questionnaire. *Raposo*, 2018 WL 1524570, at *7.

Since the questionnaire is not an opinion of an acceptable medical source, it is an opinion of an "other source." *See Taylor v Astrue*, 899 F. Supp. 2d 83, 88 (D. Mass. 2012) (finding that a "non-acceptable medical source" should be considered an "other source"). An ALJ "'generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning.'" *Id.* at 89 (quoting SSR 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006)). The ALJ's discussion of the evidence enables the court to follow his reasoning as to the questionnaire.

To the extent there are opinions expressed in the questionnaire, they are that Plaintiff had a depressive disorder not otherwise specified and that she could benefit from "weekly counseling sessions to lower depression and learn coping skills" (A.R. at 25). The questionnaire does not

include any clearly expressed opinions about the effect of depression on Plaintiff's ability to work (*id.* at 304-05). As reflected in the records, most of Plaintiff's fairly limited treatment for depression was with The Center for Psychological and Family Services (*id.* at 415-429, 598-99, 602-04). The ALJ credited the questionnaire and associated treatment records and testimony from Plaintiff insomuch as he accepted that major depressive disorder was one of Plaintiff's severe impairments (*id.* at 19). The RFC set forth limitations accommodating a mental health impairment, including that Plaintiff be limited to jobs that required her to understand and carry out only simple, routine, and repetitive tasks at a modest pace, make only simple work-related decisions, interact only occasionally with the general public, and cope with few changes in the work setting (*id.* at 21).

The ALJ's reasons for discounting the questionnaire as establishing disability by reason of a mental health impairment can be gleaned from his analysis of the so-called "Paragraph B" criteria, which includes specific references to the contents of the questionnaire (*id.* at 20) as well as his observation that "although the claimant reported severe depression, she stopped treatment when she began to improve which is inconsistent with her assertion of severe depression" (*id.* at 29). This finding is supported by the record, which shows that Plaintiff's treatment for a mental health impairment was sporadic. "'A claimant's failure to follow prescribed medical treatment contradicts subjective complaints of disabling conditions and supports [a hearing officer's] decision to deny benefits.'" *Balaguer v. Astrue*, 880 F. Supp. 2d 258, 269 (D. Mass. 2012) (quoting *Russell v. Barnhart*, 111 Fed. App'x 26, 27 (1st Cir. 2004) (citations omitted); citing *Perez Torres v. Sec'y of Health & Human Servs.*, 890 F.2d 1251, 1255 (1st Cir. 1989)); *see also O'Dell v. Astrue*, 736 F. Supp. 2d 378, 390 (D.N.H. 2010) ("Failure to seek medical treatment can be construed as evidence that an impairment is not as severe as the claimant suggests.").

In addition, on the question of Plaintiff's credibility, the ALJ found that, while her medically determinable impairments – including depression – could reasonably be expected to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record (A.R. at 27). With few exceptions, the questionnaire completed by Ms. Slezak reported Plaintiff's subjective accounts of her symptoms and limitations unfiltered by objective psychological testing to aid in the evaluation of the severity and effects of Plaintiff's depression (*id.* at 304-06). The results of a mental status exam that was completed by Ms. Slezak some two weeks before she filled out the questionnaire were within normal limits with one exception, that being that Plaintiff presented as being depressed and sad (*id.* at 419). The ALJ's summary of the questionnaire indicates that he was fully cognizant of its subjective character and of the results of the contemporaneous mental status exam (*id.* at 24). The extent to which a treating source's opinion evidence rests on a claimant's subjective, untested accounts of her symptoms and limitations is a factor on which an ALJ is entitled to rely in deciding what weight to accord to that evidence, *see, e.g., Coe v. Colvin*, Civil Action No. 15-30037-MGM, 2016 WL 3350995, at *8 (D. Mass. June 15, 2016); *Simumba v. Colvin*, Civil Action No. 12-30180-DJC, 2014 WL 1032609, at *12 (D. Mass. Mar. 17, 2014), and it is apparent that the ALJ took this factor into account in this case. *See Taylor*, 899 F. Supp. 2d at 88.

There was substantial evidence in the record supporting the ALJ's finding that Plaintiff was not disabled by a mental health impairment. The ALJ gave great weight to the evidence from Drs. Perlman and Imber, the reviewing state agency psychologists, both of whom opined that, with restrictions such as those reflected in the RFC, Plaintiff would be able to work (A.R. at 27-28, 78, 92-94). Dr. Perlman found that Plaintiff would be capable of completing simple,

routine tasks, sustain concentration for at least two hours in simple one-to-two step tasks, and relate to others in a socially appropriate manner (*id.* at 78). Dr. Imber found that Plaintiff had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace (*id.* at 88). She concluded that Plaintiff could sustain pace and focus for performing simple tasks and would focus best in a low-demand environment (*id.* at 92-94). "SSA regulations specifically provide that in appropriate circumstances, 'opinions from state agency . . . psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources.'" *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 179-180 (D. Mass. 2015) (quoting SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996)). In the absence of opinion evidence from an acceptable medical source about the effect of Plaintiff's mental health impairment on her ability to work, it was appropriate for the ALJ to give great weight to the opinion evidence from the state agency psychologists. *See Anderson v. Colvin*, Civil No. 14-cv-15-LM, 2014 WL 5605124, at *6 (D.N.H. Nov. 4, 2014) ("Without producing any opinion evidence contrary to the opinions of the state-agency consultants, or any opinions closer in time to her hearing, there was no counterweight to the opinions on which the ALJ relied. Necessarily, the ALJ relied on the only medical opinions in the record.").

In summary, the court finds no reason for the ALJ to further explain or re-evaluate the limited weight he obviously assigned to opinions in the questionnaire.

### B. Fibromyalgia

The case stands on a different footing with regard to Plaintiff's claims regarding the ALJ's failure to consider whether fibromyalgia constituted a serious impairment. "Fibromyalgia is defined as '[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause.'

*Stedman's Medical Dictionary*, at 671 (27th ed. 2000). Further, '[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities.' *Harrison's Principles of Internal Medicine*, at 2056 (11th ed. 2005))." *Johnson v. Astrue*, 597 F.3d 409, 410 (1st Cir. 2009) (per curiam). The SSA acknowledges that fibromyalgia may be a disabling condition, but requires sufficient objective evidence to support a finding that this impairment so limits a claimant's functional abilities that it precludes him or her from working. *See, e.g., Medina-Augusto v. Comm'r of Soc. Sec.*, Civil No. 14-1431 (BJM), 2016 WL 782013, at *7 (D.P.R. Feb. 29, 2016). Social Security Ruling 12-2p, 2012 WL 3104869 (July 25, 2012), sets out guidance on how the SSA develops evidence to establish that a claimant has a medically determinable impairment of fibromyalgia and how fibromyalgia is evaluated in disability claims. *Id.* at *1.

Plaintiff did not identify fibromyalgia as a disabling condition in her benefits application (A.R. at 180). At the hearing before the ALJ, however, Plaintiff's attorney asked Plaintiff to confirm that she had been diagnosed with fibromyalgia and inquired about the pain and functional limitations arising from that pain. These questions were plainly sufficient to alert the ALJ that fibromyalgia was a condition that Plaintiff was claiming caused or contributed to disability (*id.* at 58-59). Indeed, the ALJ asked Plaintiff to confirm that she had not received trigger point injections for fibromyalgia (*id.* at 64). Further, Plaintiff's medical records from treating physicians Banker, Rossen, and Ahmad indicated either a possibility or a diagnosis of fibromyalgia. In November 2014, Dr. Banker indicated that fibromyalgia was a possibility and prescribed gabapentin for Plaintiff's significant joint pain (*id.* at 434-37). June 2015 notes from Dr. Rossen, a treating neurologist, stated flatly that Plaintiff "has fibro-myalgia with multifocal pain" (*id.* at 478). In August 2015, Dr. Ahmad, a rheumatologist, noted that Plaintiff's

symptoms were "suggestive of fibromyalgia" although she did not have the tender points often used as a diagnostic tool (*id.* at 727-28).[5]   These treating physicians are "acceptable medical sources" for purposes of establishing that Plaintiff had fibromyalgia during the relevant period. *See* SSR 12-2P, 2012 WL 3104869, at *2.

There is a question on this record as to whether the "physician[s'] notes . . . are consistent with the diagnosis of [fibromyalgia]." *Id.*   Pursuant to SSR 12-2P, the ALJ was not required to conclude that the treatment records from these three physicians established a medically determinable impairment of fibromyalgia, but he was required to analyze that question using the two sets of specific criteria for a fibromyalgia diagnosis adopted by the Commissioner and to determine whether Plaintiff, through her treating care providers and her testimony, had provided the evidence necessary for the ALJ to determine if she had a medically determinable impairment of fibromyalgia.  *See id.* ("When a person seeks disability benefits due in whole or in part to [fibromyalgia], we must properly consider the person's symptoms when we decide whether the person has a[] [medically determinable impairment] of [fibromyalgia].")  The ALJ erred by ignoring Plaintiff's hearing testimony and the record references to fibromyalgia coupled with Plaintiff's subjective complaints about frequently recognized fibromyalgia symptoms such as muscle and joint pain, headaches, disturbed and unrefreshing sleep, fatigue, and worsening forgetfulness, and by failing, so far as is apparent from his opinion, to give any consideration to whether Plaintiff's medical records and testimony were sufficient to establish fibromyalgia as a medically determinable impairment.  *See Small v. Astrue*, 840 F. Supp. 2d 458, 464 (D. Mass. 2012) (remanding the case to the SSA because the hearing officer erred by summarily rejecting

---

[5] None of these physicians offered opinion evidence on functional limitations that might be attributable to fibromyalgia.

the diagnosis of fibromyalgia, "effectively preclude[ing the claimant] from relying at all on impairments relating to or arising from fibromyalgia"). It bears noting that the state agency physician assessments about Plaintiff's physical impairments, to which the ALJ gave great weight (A.R. at 27-28), were prepared in 2014 and therefore preceded all references to fibromyalgia in her records except for the initial provisional reference to fibromyalgia in a November 2014 record from Dr. Banker (*id.* at 434-38, 477-480, 727-28).

Citing *Rios v. Colvin*, No. 3:15-cv-30190-KAR, 2016 WL 7468802 (D. Mass. Dec. 28, 2016), the Commissioner argues that the ALJ was not required to identify fibromyalgia as a severe impairment in the current case because the condition was not properly diagnosed by any of Plaintiff's treating physicians. While this argument may very well have merit, the Commissioner, not the court, has the obligation to evaluate in the first instance whether or not a record such as the record in this case establishes that a claimant suffers from a medically determined case of fibromyalgia. *See, e.g., Linehan v. Berryhill*, 286 F. Supp. 3d 257, 263 (D. Mass. 2017) (rejecting the Commissioner's arguments that the ALJ's failure to explain the weight she assigned to a treating physician opinion was harmless because the court could determine from the record that the opinion was based primarily on subjective complaints and was largely consistent with the RFC determined by the ALJ; remanding the case).

"[I]t does not follow from a diagnosis of fibromyalgia that a claimant is necessarily disabled." *Barowsky v. Colvin*, Case No. 15-cv-30019-KAR, 2016 WL 634067, at *4 (D. Mass. Feb. 17, 2016) (citing cases). It is nonetheless true that if an ALJ accepts a diagnosis of fibromyalgia, the ALJ is further required to accept that the claimant suffers from the symptoms of the condition "'unless there [is] substantial evidence in the record to support a finding that [the] claimant did not endure a particular symptom or symptoms.'" *Id.* (quoting *Johnson*, 597

F.3d at 412 (quoting *Rose v. Shalala*, 34 F.3d 13, 18 (1st Cir. 1994)). This court cannot find that the ALJ's failure to address fibromyalgia is harmless. A finding that Plaintiff had been diagnosed with fibromyalgia by an acceptable medical source would require the ALJ to accept that Plaintiff suffered from the symptoms of that condition unless there was substantial record evidence establishing that she did no. Such a finding might change the ALJ's assessment of Plaintiff's credibility and might result in an adjustment of the RFC. The court expresses no opinion as to whether the records support a diagnosis of fibromyalgia by an acceptable medical source satisfying the SSA criteria, or what effect the ALJ's lack of consideration of fibromyalgia as a medically determinable impairment had on his assessment of Plaintiff's credibility, the RFC, or the opinions expressed by the VE. *See Small*, 840 F. Supp. 2d at 466. The case is remanded because the ALJ should conduct the analysis in the first instance. *See, e.g., id.*

C. Cataracts

Plaintiff's final contention that the ALJ failed to classify cataracts as a severe impairment requires little discussion. Plaintiff was diagnosed with cataracts in both eyes in March 2015. Her condition was noted to be stable and no treatment was recommended (A.R. at 641-43). Her corrected vision in each eye at this time was noted to be 20/20 (*id.* at 642), and the cataracts appeared to be stable (*id.* at 643). On June 3, 2015, Plaintiff returned to the Eye & Lasik Center. Her corrected vision in both eyes was reported to be 20/25. She was diagnosed with cataracts in both eyes. Her ocular condition was stable, although potentially progressive (*id.* at 637-39). At the hearing, Plaintiff testified that her vision had deteriorated and she was planning to return to the eye doctor to see if she was "ready" to get the surgery (*id.* at 60-61). The record is bereft of objective medical evidence substantiating functional limitations attributable to cataracts or any other vision impairment. There is no evidence any physician restricted Plaintiff from driving or

opined on limitations resulting from vision impairments.  The ALJ was left with Plaintiff's

subjective complaints about the limits in her ability to see resulting from developing cataracts,

which he summarized accurately in his decision (*id.* at 23).  Where the objective medical

evidence in the record does not appear consistent with Plaintiff's claims of functional limitations,

the ALJ was not required to credit her assertions.  On this record, there is no basis to conclude

that Plaintiff's cataracts constituted a severe medical impairment or limited her ability to work.

*See generally Torres v. Sec'y of Health & Human Servs.*, 870 F.2d 742 (1st Cir. 1989) (affirming

denial of disability benefits for a claimant who had some visual limitations after cataract

surgery).

## VII.    Conclusion

For the reasons stated, Plaintiff's motion for judgment on the pleadings (Dkt. No. 14) is

GRANTED in part and the Commissioner's motion for an order affirming the decision (Dkt. No.

16) is DENIED.  The case is remanded for further administrative proceedings consistent with

this opinion.

It is so ordered.

Dated: August 6, 2018                                  /s/ Katherine A. Robertson____
                                                       KATHERINE A. ROBERTSON
                                                       United States Magistrate Judge